**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| APRILL L. WARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 24 C 13248 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| UNITED AIRLINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

After Plaintiff Aprill Ward, a 65-year-old African American woman, lost her position as a flight attendant, she filed this lawsuit against her former employer, Defendant United Airlines, Inc. ("United"). In her first amended complaint, she alleges that United engaged in race and age discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981 ("Section 1981"); and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a). United has moved to dismiss the Section 1981 race-based discrimination claim, as well as the retaliation claims, pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court grants in part and denies in part United's motion. Because Ward does not allege that racial animus was the but-for cause of her termination, the Court dismisses Ward's Section 1981 race-based discrimination claim. But because Ward has sufficiently pleaded her retaliation claims, the Court denies United's motion to dismiss those claims.

**BACKGROUND[1]**

Ward worked as a flight attendant for United for 33 years. She consistently met or exceeded United's performance expectations.

**I.      December 29, 2023 Flight**

Ward reported for duty at the gate in Chicago for a flight to London on December 29, 2023. She introduced herself to the crew, including multiple flight attendants and the purser. A purser acts as the chief flight attendant of the cabin crew. This flight's purser was non-Black, younger than Ward, and someone with whom Ward had not previously worked. The purser greeted Ward by saying "Oh I can see you're the most senior one here," and then started a briefing with the flight attendants. Doc. 23 ¶ 10.

Ward has a medical condition for which she takes injectable medicine. While on the flight to London, Ward started to feel ill and so during a break, she took her suitcase down from its storage spot to get the necessary supplies to inject her medicine. She entered the back lavatory to inject her medicine, exited the lavatory, put her suitcase back in its storage spot, resumed her break in her assigned break seat, and fell asleep. She woke up feeling better and completed the rest of her duties without issue.

During a routine debriefing after the flight landed, one of the other flight attendants mentioned that Ward had hit the call button multiple times while she was in the lavatory. This same attendant also stated that Ward had poked the other flight attendant in her sleep and blocked an area with her suitcase. Although the flight attendant did not say anything when these issues occurred, Ward apologized and explained that she had felt ill during the flight. The attendant seemingly accepted Ward's explanation.

---

[1] The Court takes the facts in the background section from Ward's complaint and presumes them to be true for the purpose of resolving United's motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

On the shuttle back from the terminal, the purser mentioned that the pilot and an agent had an argument when the pilot almost forgot to turn off the fasten seatbelt sign before the flight attendants opened the cabin door, which would have caused an emergency slide to deploy. The purser said he had caught the error and was thinking about reporting the incident.

## II. December 31, 2023 Flight

Ward next reported for duty on December 31, 2023 for the return trip to Chicago. During the shuttle ride to the terminal, the purser brought up the other flight attendant's complaints about Ward's suitcase blockage and her pressing the call button in the lavatory. Ward again explained that she had felt ill but told the purser that she was willing to refuse any breaks on the return flight.

During the return flight, Ward asked the purser to come to the back of the plane, which he did after everyone started their break. She attempted to "clear the air with him," but he said to Ward: "I don't care if you were sick, I need more effort in service. You need to set up the galley." *Id.* ¶ 15. Ward felt surprised by the request because United pays flight attendants who set up the galleys more and this responsibility fell on another flight attendant on this flight. Ward nonetheless said she was willing to help set up the galley but reminded the purser that her job responsibilities did not include galley work under union rules. The purser became visibly angry, replied, "I'm the boss," and walked away from the back of the plane. *Id.*

Later in the flight, Ward again tried to talk to the purser, but he said that the captain had called a "Level One threat" on her. *Id.* ¶ 16. Ward thought the purser was joking because the captain should know that a Level One threat call was highly improper and a rule violation because she had not engaged in any action to justify such a call. When Ward told the purser that he must be joking, the purser did not respond and departed.

3

Ward then called the captain to ask if he had called a Level One threat on her. The captain told Ward to "sit down or it will be a Level Two or Three" and hung up. *Id.* ¶ 17. Although Ward had never met the captain, she believed that the captain had her photo in his flight log and so he therefore knew Ward's race and age. Following orders, Ward started towards the galley to sit down in her jump seat, but the purser and a cart blocked her path. The cart also blocked a lavatory. To protect herself from any accusation that she was not following orders, Ward took a photo of the cart to show that she could not reach her seat at the back of the plane. As she snapped the photo, the purser made a crude gesture towards Ward with his finger. Ward then proceeded to a jump seat in the front of the plane near the cockpit door.

After landing, the purser at first made routine announcements. But when Ward got up to attend to her duties, including guarding the exit doors, the purser announced that all passengers should remain seated until individuals removed Ward from the plane. After she and then all passengers had exited the plane, Ward's supervisor asked Ward why she was already off the plane. During this conversation, Ward cried. Then the crew debriefed, but the pilot and first officer did not stay for the debriefing, and no one mentioned the Level One threat incident.

### III. Early 2024 Events

A few days after the December 31 flight, a United performance supervisor called Ward. The supervisor told Ward that she was investigating the Level One threat. Ward told the supervisor that she was going to report safety incidents from the December 29 and 31 flights to the Federal Aviation Administration ("FAA").

Days after this call with the supervisor, Ward received a call from a union representative who informed Ward that United wanted to fire her, "no ifs, ands or buts." *Id.* ¶ 24. Ward felt shocked because no investigator had asked Ward about her side of the events. Ward asked the

union representative if United could fire her before an investigation. Ward also told the union representative that she was going to report her safety concerns to the FAA and her age and racial discrimination concerns to the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights. On information and belief, the union representative informed United of Ward's reporting intent.

Ward attended an "appeals meeting" a few weeks later with the union and the United performance supervisor. *Id.* ¶ 25. Although no witnesses appeared, United allowed Ward to read witness reports. Ward remembers the captain's report referring to her as "that senior lady" rather than her name. *Id.* The United performance supervisor confronted Ward with an allegation that she did not sit down when told to do so by the captain on the December 31 flight. Ward responded that she had sat down and never failed to follow orders. The United performance supervisor also alleged that Ward had disappeared during service, went to the lavatory for a long period, blocked access to the lavatory with her bags, hit the call button more than once when she was in the lavatory, and elbowed a crew member on the December 29 flight. Ward responded with her version of events. But no one mentioned the Level One threat during this meeting.

Ward reported safety violations to the FAA on or about January 19, 2024. On an unspecified date, Ward filed a charge of discrimination with the EEOC. On or about February 1 or 2, United informed Ward that it was formally terminating her employment. Ward received a written notice of the termination decision on February 7, 2024. On September 24, 2024, the EEOC issued Ward a Notice of Right to Sue.

Ward notes that during her time with United, employees "widely discussed" United's culture of age discrimination because the company "made a concerted attempt to rid itself of

'senior old ladies.'" *Id.* ¶ 33. Ward references unspecified "reports" that indicate at least one senior executive has said that United has too many senior flight attendants and the company must remove them by any means necessary. *Id.*

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**ANALYSIS**

**I.       Section 1981**

United first seeks dismissal of Ward's Section 1981 race discrimination claim on the basis that such a claim requires race to be the "but for" cause of the alleged employment action, and Ward pleads that United discriminated against her because of her race and age. "To prevail [on a Section 1981 claim], a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).

United cites this Court's decision in *Arora v. NAV Consulting Inc.* to support its argument. No. 21 C 4443, 2022 WL 7426211 (N.D. Ill. Oct. 13, 2022). In *Arora*, the plaintiff sued his former employers, alleging discrimination during his employment based on race, ethnicity, national origin, and citizenship status under various federal and state statutes. After defendants moved for judgment on the pleadings on plaintiff's Section 1981 race-based discrimination claim, this Court joined other courts' interpretation of *Comcast* to find that "a plaintiff cannot allege multiple discrimination theories as the 'but for' cause for a Section 1981 violation." *Id.* at *2. While the Court acknowledged that a plaintiff may plead multiple causes under other discrimination laws, racial discrimination must be the "determining factor" to successfully plead a Section 1981 claim. *Id.* (quoting *Piccioli v. Plumbers Welfare Fund Local 130, U.A.*, No. 19-CV-00586, 2020 WL 6063065, at *6 (N.D. Ill. Oct. 14, 2020)). Applying this rule to the plaintiff's complaint, the Court determined that the plaintiff did not "parse the specifics of his race-based claim" such that the plaintiff's race, rather than his ethnicity or national origin, constituted "but for" cause, and therefore granted the defendants' motion for judgment on the pleadings. *Id.* at *3.

Ward essentially raises the same arguments that the Court rejected in *Arora*. Ward cites one Northern District of Illinois case, *Hutchens v. Devasiachen*, No. 24 C 490, 2025 WL 692091 (N.D. Ill. Mar. 4, 2025), and one District of Minnesota case, *Walton v. Medtronic USA, Inc.*, No. 22-CV-50, 2023 WL 3144320 (D. Minn. Apr. 28, 2023), to highlight a split among the lower courts on this issue and urge the Court to reconsider its *Arora* decision. But nothing in Ward's argument nor those courts' opinions persuade this Court to depart from its *Arora* analysis, especially considering the majority of courts in this circuit to consider the issue agree with this Court's original outcome. *See, e.g.*, *Shah v. Hy-Vee, Inc.*, No. 23 C 50353, 2026 WL 221884, at

*5 (N.D. Ill. Jan. 28, 2026); *Malhotra v. CVS Health Corp.*, No. 24 C 4769, 2025 WL 2453807, at *3 (N.D. Ill. Aug. 4, 2025); *Hill v. Target Corp.*, No. 24 C 341, 2025 WL 919614, at *4 (N.D. Ill. Mar. 26, 2025); *EEOC v. Sis-Bro Inc.*, No. 24 C 968, 2025 WL 213992, at *3 (S.D. Ill. Jan. 16, 2025).

Ward also tries to distinguish her case from *Arora*, contending without any citations to her amended complaint that she parsed the specifics of her race-based claim from her age-based claim. But this Court's review of the amended complaint does not reveal such a distinction. In fact, her limited race-based allegations always share the sentence with her age-based allegations. *See, e.g.*, Doc. 23 ¶ 17 ("She had never met the Captain although on information and belief her photo was in the flight photos in the Captain's flight log, and on information and belief [he] knew her race and age."); *id.* ¶ 20 ("Later a claim would be made about Aprill blocking a mid-cabin lavatory on the previous flight when she took her medicine out, but on information and belief no action was taken against non-Black or younger purser for blocking the lavatory."). And as a last effort, Ward asserts that equitable principles advise against dismissing her Section 1981 race-based claim at the pleadings stage because the Court should allow her to plead alternative theories. But as the Court stated in *Arora*, Ward "does not really plead *in the alternative*; rather, [s]he asserts that race [and age both] motivated [United]'s actions, causing violations of various state and federal civil rights laws." *Arora*, 2022 WL 7426211 at *3.

The Court therefore dismisses Ward's Section 1981 claim based on racial discrimination without prejudice.

## II.  Retaliation

United also seeks dismissal of Ward's retaliation claims because Ward's allegations suggest that United decided to terminate her before she engaged in any protected activity. To

state a Title VII retaliation claim, a plaintiff must allege that she "engaged in statutorily protected activity and was subjected to an adverse employment action as a result." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) (quoting *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1029 (7th Cir. 2013)).  The Seventh Circuit has applied the same elements to ADEA and Section 1981 retaliation claims that it applies in cases involving Title VII retaliation.  *See Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022) (ADEA); *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (Section 1981).

United does not dispute that Ward engaged in statutorily protected activity when she communicated her intent to report age and race discrimination or that she suffered an adverse employment action when United terminated her employment.  United instead argues that Ward fails to plead that she suffered an adverse employment action *because* she engaged in a protected activity.  United specifically contends that Ward's amended complaint indicates that Ward's union representative told Ward that United "was determined to fire her, 'no ifs, ands or buts,'" *before* the company learned that Ward wanted to report the alleged age and racial discrimination.  Doc. 23 ¶ 24.  United's argument depends on characterizing the union representative's statement as a final termination decision and therefore, the adverse action.  But "the mere threat of termination, standing alone, is only the threat of an adverse employment action, not an adverse employment action itself." *Chisholm v. Foothill Cap. Corp.*, 3 F. Supp. 2d 925, 937–38 (N.D. Ill. 1998).  And United's characterization of the union representative's comment ignores Ward's subsequent allegations, which state that United did not formally terminate her employment until a few weeks after Ward's conversation with the union representative and after an appeals meeting.  *See Jenkins-Allen v. Powell Duffryn Terminals, Inc.*, 18 F. Supp. 2d 885, 893 (N.D. Ill. 1998) (explaining that a threat of discharge, which did not materially affect the terms and

9

conditions of employment, does not constitute an adverse action for purposes of a retaliation claim).

At this stage, the Court must draw all reasonable inferences in Ward's favor. And based on the allegations in the amended complaint, one can reasonably infer that United terminated Ward after it learned about her intent to report United's alleged age and race discrimination through Ward's union representative. Although this claim may not survive a summary judgment motion, this is enough to survive dismissal. *Carter v. Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015) ("Retaliation occurs 'when an employer takes an adverse employment action against an employee for opposing impermissible discrimination.'" (quoting *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012) (overruled in part on other grounds))).

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part United's motion to dismiss [40]. The Court dismisses Ward's Section 1981 race-based discrimination claim without prejudice.

Dated: April 15, 2026

_____
SARA L. ELLIS
United States District Judge

10